**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SCOTT CLEVELAND** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-13559** |
| **JASON KENT, WARDEN** | **SECTION: "H"(1)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Scott Cleveland, is a state prisoner incarcerated at the Dixon Correctional Institute in Jackson, Louisiana. On July 20, 2011, he was convicted of simple rape under Louisiana law.[1] On August 5, 2011, he was sentenced to a term of fifteen years imprisonment.[2] On April 10, 2013, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[3] The Louisiana Supreme Court then denied his related writ application on November 8, 2013.[4]

[1] State Rec., Vol. 2 of 4, transcript of July 20, 2011, p. 162; State Rec., Vol. 1 of 4, minute entry dated July 20, 2011.
[2] State Rec., Vol. 2 of 4, transcript of August 5, 2011; State Rec., Vol. 1 of 4, minute entry dated August 5, 2011.
[3] State v. Cleveland, 115 So. 3d 578 (La. App. 4th Cir. 2013); State Rec., Vol. 1 of 4.
[4] State v. Cleveland, 125 So. 3d 444 (La. 2013); State Rec., Vol. 1 of 4.

On or after March 27, 2014, petitioner filed an application for post-conviction relief with the state district court.[5] That application was denied on August 15, 2014.[6] His related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on December 17, 2014,[7] and by the Louisiana Supreme Court on December 7, 2015.[8]

On July 28, 2016, petitioner filed the instant federal application seeking habeas corpus relief.[9] The state has filed a response in opposition.[10]

As an initial matter, the undersigned notes that the state argues that petitioner's federal application is untimely.[11] Although the state makes a solid argument on that point, its ultimate conclusion is not beyond debate for the following reasons.

The state's argument is premised on a contention that neither petitioner's direct-review writ application nor his collateral-review writ application was filed within the thirty-day deadline set forth in Louisiana Supreme Court Rule X, § 5(a). However, while that is true, the state concedes that, in both instances, petitioner filed motions for an extension of time within the thirty-day periods.

In response to his motion for an extension of time to file his direct-review writ application, the Central Staff of the Louisiana Supreme Court sent petitioner a letter stating:

> Your request for an extension of time has been filed and given the above number. You should send your application as soon as you are able, preferably

[5] State Rec., Vol. 1 of 4. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). The date on which that occurred here is not apparent from the record. However, in that petitioner signed the application on March 27, 2014, he could not have placed it in the prison mailing system prior that date.
[6] State Rec., Vol. 1 of 4, Docket Master entry dated August 15, 2014.
[7] State v. Cleveland, No. 2014-K-1247 (La. App. 4th Cir. Dec. 17, 2014); State Rec., Vol. 1 of 4.
[8] State *ex rel.* Cleveland v. State, 180 So.3d 1280 (La. 2015); State Rec., Vol. 1 of 4.
[9] Rec. Doc. 1. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner has declared under penalty of perjury that he placed his application in the prison mailing system on July 28, 2016. Rec. Doc. 1, p. 14.
[10] Rec. Doc. 9.
[11] Id. at pp. 7-14.

> within 60 days from the date of this letter. Your application will be filed as a supplement to the filing under the above number. The filing of your request for an extension and any supplemental application does not represent a finding by this Court that your filings are or are not timely.[12]

Petitioner complied with those instructions.

With respect to his motion for an extension of time to file his collateral-review writ application, the state appears to concede that petitioner again received an acknowledgement of his filing, although no copy of that acknowledgement was preserved in the state court record.[13] If so, there is no reason to believe that petitioner failed to again comply with the instructions contained in the acknowledgement.

Where, as here, a petitioner has filed a motion for extension within the thirty-day deadline, courts have reached differing conclusions as to whether that was sufficient for a habeas court to assume that the writ application ultimately filed was considered timely by the Louisiana Supreme Court if its opinion does not address the writ's timeliness. Some courts have answered in the negative. See, e.g., Price v. Cain, Civ. Action No. 11-0641, 2012 WL 6765377, at *5 (E.D. La. Oct. 23, 2012) (Chasez, M.J.) ("While Price, within the 30-day time period, filed a motion for an extension of time, such a pleading does not extend the 30-day time limit. Rule X, § 5(a) specifies that '[n]o extension of time ... will be granted.'"), adopted, 2013 WL 55913 (E.D. La. Jan. 3, 2013) (Feldman, J.); Boudreaux v. Cain, Civ. Action No. 07-1041, 2009 WL 4730706, at *3 (E.D. La. Dec. 9, 2009) (Feldman, J., adopting the recommendation of Moore, M.J.). Other courts have taken the opposite view, at least where, as here, the petitioner received a letter from the court giving him an extension of time for filing. See, e.g., Chisley v. Terrell, Civ. Action No. 12-1261, 2013 WL 3899962, at *4 (E.D. La. July 29, 2013) (Morgan, J., adopting the recommendation of

---

[12] State Rec., Vol. 4 of 4, Letter from Central Staff to petitioner dated April 26, 2013.

[13] Rec. Doc. 9, p. 11 n.13.

Chasez, M.J.); Wilbon v. Jones, Civ. Action No. 11-115, 2011 WL 3626672, at *1 n.11 (E.D. La. June 27, 2011) (Shushan, M.J.), adopted, 2011 WL 3626669 (Aug. 17, 2011) (Vance, J.); Hill v. Cooper, Civ. Action No. 04-2588, 2007 WL 458207, at *2 n.23 (E.D. La. Feb. 8, 2007) (Lemmon, J., adopting the recommendation of Knowles, M.J.).[14]  This conflict in the jurisprudence on this issue gives the undersigned pause.

Further, the undersigned finds that it is appropriate to err on the side of caution when faced with such an unclear issue concerning the timeliness of a federal habeas petition.  See Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999) ("We must be cautious not to apply the statute of limitations too harshly.  Dismissal of a first habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." (quotation marks omitted)).

In light of these considerations, and because petitioner's underlying claims do not warrant relief in any event, the undersigned recommends that the Court pretermit a ruling on the timeliness issue out of an abundance of caution and instead simply deny the claims for the following reasons.[15]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in

---

[14] In Butler v. Cain, 533 F.3d 314, 319 (5th Cir. 2008), the United States Fifth Circuit Court of Appeals cited but distinguished the Hill decision.  However, the Court of Appeals did not expressly take a position as to whether Hill was rightly or wrongly decided.

[15] A federal habeas court may pretermit a ruling on timeliness when it can more easily dispose of a petition on other grounds.  See, e.g., Sokolowski v. Prince, Civ. Action No. 14-110, 2015 WL 631425, at *3 n.28 (E.D. La. Feb. 13, 2015); Gordon v. Cain, Civ. Action No. 12-1884, 2013 WL 3833076, at *2 n.22 (E.D. La. July 22, 2013); Brooks v. McCoy, No. 5:11-HC-2222-F, 2012 WL 3629233, at *4 (E.D.N.C. Aug. 22, 2012).

reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

## II. Petitioner's Claims

### A. Juror Bias

Petitioner's first claim is that his rights were violated by the trial court's failure to hold a hearing to give him an opportunity to prove actual bias on the part of the potential jurors. The state argues that this claim is unexhausted and, because it would now be procedurally defaulted in state court, it is also procedurally barred from federal review. The state is correct.

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and

correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (quotation marks omitted). The United States Supreme Court has explained:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. Under our federal system, the federal and state courts are equally bound to guard and protect rights secured by the Constitution. Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

Rose v. Lundy, 455 U.S. 509, 518 (1982) (citations, footnote, quotation marks, and brackets omitted).

Moreover, "[t]o exhaust, a petitioner must have fairly presented the substance of his claim to the state courts." Wilder v. Cockrell, 274 F.3d 255, 259 (5th Cir. 2001) (quotation marks omitted). However, it is clear that petitioner has never fairly presented *this* claim, i.e. that the trial court violated his rights by *failing to hold a hearing giving him the opportunity to prove actual bias on the part of the potential jurors*, to the state courts.[16] Therefore, the claim is unexhausted.

---

[16] On direct review, petitioner did present to the state courts a *different* claim concerning the jury selection process, i.e. that he had been *wrongly forced to exhaust his peremptory challenges* after the trial court erroneously denied defense challenges for cause (a ground for reversal under Louisiana law). See State v. Cleveland, 115 So. 3d 578, 585 (La. App. 4th Cir. 2013) ("Cleveland complains that the trial court erred in denying his challenges for cause as to five prospective jurors. He maintains that the error forced him to exhaust his peremptory challenges to excuse juror numbers five, nine, thirteen, and sixteen … and juror number twenty-five …."). Because that claim rested on different facts and theories than his instant claim, it did not render the instant claim exhausted. See Ogan v. Cockrell, 297 F.3d 349, 358 (5th Cir. 2002); Burns v. Estelle, 695 F.2d 847, 849-50 (5th Cir. 1983).

    Out of an abundance of caution, the undersigned additionally notes that even if petitioner had reasserted that same claim in this federal proceeding, it would not be cognizable. The United States Supreme Court has held:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

Ross v. Oklahoma, 487 U.S. 81, 88 (1988) (citations omitted); accord Edwards v. Stephens, 612 Fed. App'x 719, 722 (5th Cir. 2015) ("[T]he forced use of a peremptory challenge does not rise to the level of a constitutional violation. Instead, a district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if

Further, as the state also notes in its response, petitioner's failure to exhaust his claim in the state courts presents an additional problem and basis for dismissal, i.e. a procedural bar in federal court. Where, as in the instant case, a "prisoner fail[ed] to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," then his claims are likewise considered defaulted in federal court. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (internal quotation marks omitted). Here, there is little doubt the state courts would deny any new attempt by petitioner to assert the instant claim as procedurally barred. In fact, in denying relief in connection with his post-conviction writ application, the Louisiana Supreme Court held:

> Relator has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the Legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Relator's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, relator has exhausted his right to state collateral review. [17]

---

the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." (citation and quotation marks omitted)).

Because defense counsel used peremptory challenges to strike the jurors in question and because petitioner has failed to demonstrate that the jury ultimately selected was not impartial, he has no cognizable federal claim. See Dorsey v. Quarterman, 494 F.3d 527, 533 (5th Cir. 2007); Lagrone v. Cockrell, No. 02-10976, 2003 WL 22327519, at *12 (5th Cir. Sept. 2, 2003); Arita v. Cain, Civ. Action No. 11-636, 2011 WL 4738666, at *29 (E.D. La. Aug. 25, 2011), adopted, 2011 WL 4738658 (E.D. La. Oct. 6, 2011), aff'd, 500 Fed. App'x 352 (5th Cir. 2012); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *27 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011); Stoves v. LeBlanc, Civ. Action No. 04-2037, 2010 WL 3523012, at *12 (E.D. La. Apr. 10, 2009), adopted, 2010 WL 3522957 (E.D. La. Sept. 1, 2010); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *12 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011).

That result is not changed by the fact that Louisiana state law provides relief when a defendant's challenge for cause is erroneously denied and the defendant then exhausts all his peremptory challenges. Because that is a protection afforded only by *state* law, a violation of that protection is not cognizable in a federal habeas corpus proceeding. Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of *state* law will not suffice. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).

[17] State *ex rel.* Cleveland v. State, 180 So.3d 1280, 1281 (La. 2015); State Rec., Vol. 1 of 4.

In light of the foregoing, federal review of petitioner's claim is barred unless he demonstrates either (1) the existence of "cause" for his default and resulting "prejudice" or (2) that the Court's failure to address the claims would result in a "fundamental miscarriage of justice." See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-57 (5th Cir. 2004).

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted). Here, petitioner has not established cause for his default, and, "[a]bsent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

In that petitioner has not met the "cause and prejudice" test, his unexhausted claim is barred from federal review unless the application of the procedural bar would result in a "fundamental miscarriage of justice."

In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court applied this "fundamental miscarriage of justice" exception. In so doing, the Supreme Court noted that "the fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the *extraordinary* case." 513 U.S. at 324 (emphasis added). The Supreme Court therefore held that, for the exception to apply, a petitioner must show that, in light of new evidence, "a constitutional violation has *probably resulted* in the conviction of one who is *actually innocent*. To establish the requisite probability, *the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence*." Id. at 327 (citation and quotation marks omitted; emphasis added).

Here, petitioner was convicted of the simple rape of S.H. As the Louisiana Fourth Circuit Court of Appeal noted on direct appeal, that crime is defined to include oral sexual intercourse "[w]hen the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity."[18] Petitioner claims that he is actually innocent of that crime.

In House v. Bell, 547 U.S. 518 (2006), the Supreme Court noted that when evaluating an actual innocence claim,

> the habeas court must consider all the evidence, *old and new*, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

547 U.S. at 538 (citations and quotation marks omitted; emphasis added).

Accordingly, this Court will first examine the "old" evidence in this case, i.e. the evidence presented at trial, on which petitioner's conviction was based. The Louisiana Fourth Circuit Court of Appeal recounted that evidence as follows:

> S.H., the victim,[FN 1] related that on 23 May 2010, she and friends, Antineeka Williams, Shintia Taylor, and others, went to the Bridge Lounge in New Orleans between 5:00 and 6:00 p.m. after attending a crawfish boil earlier in the day. While at the lounge, she met more friends with whom she socialized and drank until approximately 9:00 p.m. One of the victim's acquaintances assisted the victim from the lounge to a parked car because she was drunk and boisterous. The next thing the victim remembered was being outside of the car on the sidewalk with Ms. Taylor helping her put her clothes back on. She did not remember how she got from the car to the sidewalk or how her clothes were removed. She denied knowing Cleveland or seeing him outside the Bridge Lounge that evening. She did not consent to having sex with him. The last thing she remembered from that night was

[18] State v. Cleveland, 115 So. 3d 578, 584 (La. App. 4th Cir. 2013) (quoting the La. Rev. Stat. Ann. § 14:43(A)(1)); State Rec., Vol. 1 of 4. In the 2015, the statute was amended to change the name of the offense from "simple rape" to "third degree rape"; however, the substance of the quoted provision was not changed.

arriving at a local hospital with Ms. Taylor and undergoing a rape exam. She spoke with two detectives at the hospital and told them that she did not recall consenting to or having oral sex with anyone that night. The following day, the victim spoke with her friend Isaiah Boyd, who was at the lounge with her the previous night.

[FN 1] The victim's privacy is protected in this opinion by the use of her initials, S.H.

On cross-examination as on direct, S.H. admitted that she had several drinks at the crawfish boil, and that she had several more drinks later that evening at the Bridge Lounge. She also admitted to having smoked marijuana at about 1:00 p.m. on that day and also having taken Valium. The victim remembered telling the nurse at the hospital that she was confused about the night's events and did not know how many drinks she had had.

Ms. Taylor testified that she and the victim had been friends since high school and were together on the night of 23 May 2010. She met the victim that day about 3:00 p.m. at a crawfish boil located on the river. During the two hours that she and the victim spent at the crawfish boil, they both drank daiquiris. From the crawfish boil, they went to the Bridge Lounge at about 6:00 p.m. and continued to drink. At about 9:00 p.m., the victim was drunk and getting very loud. Consequently, Ms. Taylor's friend, Robin, escorted the victim to Ms. Taylor's car, which was parked on the side of the lounge, and placed her in the front seat. Robin returned to the lounge and gave Ms. Taylor her car keys. A few moments later, two male friends entered the lounge and told Ms. Taylor that the victim was in the street unclothed. She went outside and found the victim on the curb next to Ms. Taylor's car. (It took multiple individuals to lift the victim from the ground.) The victim was in a daze and unable to tell Ms. Taylor what had happened. She redressed the victim and drove her to the hospital.

During cross-examination, Ms. Taylor advised the court that she did not know Cleveland, and that she did not see him in the Bridge Lounge on the night of 23 May 2010. She did not witness the victim engage in any sexual act with Cleveland. Though Ms. Taylor recalled speaking to two detectives that night, she could not remember what the conversations were about.

The victim's friend, Isaiah Boyd, recounted that he and the victim had been friends since grade school. He recalled running into the victim at the Bridge Lounge on 23 May 2010. They reminisced and had a drink. He received a telephone call just before nightfall and left the lounge. When he returned to the lounge thirty-five to forty-five minutes later, he did not see the victim, so he had a drink, and thereafter left. As he walked to his car, he saw three people, one woman and two men, on the ground engaged in sexual activity that he assumed was consensual. As he made a telephone call in his car, the bartender from the lounge came outside and told the three people they had to leave. Because the bartender was his friend, Mr. Boyd approached the three people to help in dispersing them. Mr. Boyd noticed the female lying on the ground with her clothes open. One male was at her upper torso, and the second was on her lower torso. The women's [sic] breasts were exposed, and one of the men was sucking on the woman's breasts.

The second man had his head between the woman's legs. Mr. Boyd identified Cleveland as the man with his head between the woman's legs. After the bartender told the three people to leave, another man walked around the corner and screamed, "That's [the victim]." That being said, Mr. Boyd reentered the lounge and informed the victim's friends. By that time, the two men had departed, and the victim remained motionless on the ground. The victim's friends placed the victim in one of their cars. The following day, the victim called him and asked what happened the night before. He related to her what he observed that night, and she burst into tears.

Wayne Jolla, the bartender at the Bridge Lounge on the night of this incident, testified that the victim arrived at the lounge with friends at about 6:00 p.m. During the night, he prepared one Mojito for her. At about 8:30 p.m., her friends took her outside because they said she was inebriated. Mr. Jolla said S.H. appeared tipsy but not drunk. Later that night at about 10:15 p.m., a man in the bar told Mr. Jolla, "Something is going on on the side of the bar you need to go take a look at." Mr. Jolla went outside and found the victim on the ground, naked and unresponsive. One of the two men on the victim had his mouth on the victim's vagina, and the other was down there with "his stuff" in his hand. Mr. Jolla said that the victim seemed to be highly intoxicated – that she did not know what was going on. When he told the two men to disperse, they walked in opposite directions. Mr. Jolla went into the bar and informed the victim's friends, who redressed her, called the police, and drove her to the hospital.

Detective Clifton Neely of the New Orleans Police Department ("NOPD") Sex Crimes Division met the victim at University Medical Center at about 3:30 a.m. on 24 May 2010. He found her incoherent and intoxicated to the point that she was unable to give him a statement. The following day, Detective Neely spoke to some witnesses and developed Cleveland as a suspect, and thereafter, he secured an arrest warrant for him. Detective Neely compiled a six-person lineup, which he presented to Isaiah Boyd. Mr. Boyd told him that he could not be sure that Cleveland was in the lineup, so the detective wrote "negative lineup" on the photos and put them in his folder. Detective Neely showed Mr. Boyd a copy of the lineup from which Mr. Boyd positively identified Cleveland as the person he saw outside the Bridge Lounge with the victim. Detective Neely spoke with the victim on one occasion following their initial interview, but she was never able to remember the events the night of the assault. The facts Detective Neely gleaned were obtained from the victim's friends.

Ashly Butler, Cleveland's friend and co-worker, testified that he and Cleveland worked together for about two months at the time of the occurrence of the incident. The day after the incident Cleveland arrived late for work in a frantic and disheveled condition. He told his boss, Paul Tufaro, that he had hooked up with a young black woman the night before. He explained that the woman stumbled out of the Bridge Lounge obviously intoxicated. He approached her, and she told him she wanted him to perform oral sex on her, which he did. Mr. Butler asked Cleveland, "Well, did you f--- her," and Cleveland replied "no." Cleveland mentioned to him that during the oral copulation, a "Mexican" man tried to "get in on the action," but Cleveland shooed him away. Mr. Butler said that Cleveland

> claimed the woman spoke, but did not say that she was necessarily incoherent, during the sex act.
>
> Paul Tufaro, Cleveland's employer at the time of the incident, recounted that he received a call from Cleveland at about 7:00 a.m. on 24 May 2010, in which Cleveland said he would be late for work. Cleveland explained that a strange occurrence happened the night before that kept him up all night and that he was not sure if it was worth it. When Cleveland arrived at work, he proceeded to explain to Mr. Tufaro and Mr. Butler what had happened the night before. He said that a woman stumbled out of the Bridge Lounge and asked him to perform oral sex on her, which he did. Cleveland claimed that the victim was coherent and that she wanted him to perform oral sex on her. Cleveland said that eventually the bartender came outside and ran him away. Mr. Tufaro thought Cleveland's story was very strange, so he called the Bridge Lounge to confirm what Cleveland had said. The lounge employee gave Mr. Tufaro the name of the investigating officer, whom Mr. Tufaro called and related what Cleveland had told him.
>
> Dr. William J. George, an expert in toxicology, testified for the defense. The doctor testified that he reviewed S.H.'s medical records. The testing results for marijuana indicated that the victim had ingested the drug, but he could not specify when and how much of the drug she had consumed. Testing was positive for the presence of benzodiazepines in the victim's system; however, the victim's blood was not tested for the presence of alcohol. Based upon information he received relative to the victim's consumption of four drinks on the night of the incident, Dr. George opined that the victim would have been "high" but not close to unconsciousness, and legally intoxicated.
>
> On cross-examination, Dr. George confirmed that if the victim had ingested marijuana, Valium, and alcohol in a relatively short time, she would be very intoxicated.
>
> Misa Eiritz of the Public Defender's Office testified that she interviewed Mr. Jolla about what beverages he served the victim at the Bridge Lounge on the night of the incident. He told her that he served the victim one alcoholic drink and water. She also said that Mr. Jolla told her that when he went outside to where the victim was, Cleveland said to him, "Why are you shooing me away? I didn't do anything wrong."[19]

However, it should be noted that the petitioner argues that the Court of Appeal's foregoing summary is "an unreasonable determination of the facts."[20] In his federal application, he recounts *his version* of the events as follows:

> On May 23, 2010, around 9:40 p.m. in the evening, a somewhat intoxicated petitioner Scott Cleveland (Cleveland) left his apartment on Magazine Street in New Orleans, Louisiana on his way to a neighborhood store. As he walked by the upscale Bridge Lounge located in New Orleans, Louisiana, Cleveland ran into a

[19] State v. Cleveland, 115 So.3d 578, 581-83 (La. App. 4th Cir. 2013); State Rec., Vol. 1 of 4.
[20] Rec. Doc. 1, p. 17 n.1.

similarly intoxicated, attractive, young black woman named [S.H.], who asked him for a cigarette. She was in the process of sitting down on the curb of the street to put her jump suit on. She appeared to be somewhat surprised to know that Cleveland discovered her attempting to dress as she was caught in the awkward position of exposing her bra and panties because of the style and design of her jump suit outfit.

To dress, she had to put the outfit on through the top shoulder area with only her right leg fully covered by the outfit. Cleveland somewhat curious and perplexed by her semi-nude predicament handed her a cigarette and asked her if she was okay. She didn't appear to be any more intoxicated than he was. Cleveland engaged S.H. in small talk while she smoked her cigarette and stopped dressing. She appeared at ease and uninhibited by her obvious public display of nudity. She informed Cleveland that she came with her friend to the Bridge Lounge to see "Treme" that night when she surprisingly caressed the back of his hair.

From her caressing gesture and soft tone of her voice, Cleveland sensed that this beautiful young, black woman, about 24 (half his age) was in a romantic mood and making a pass at him. Cleveland wondered if he should correspond to her seductive gestures. Cleveland invited her to his apartment which was just down the street to have something to drink but she said she couldn't because she come with her friend and wouldn't have a ride home. Cleveland was much older, white, single male and twice her age. He was awed by her romantic interest in him, but cautious knowing full well that the ritzy Bridge Lounge was a magnet for woman on the low end of the socio-economic ladder looking for men with the financial means to help them out of their status.

Curiously, Cleveland made one final effort to reciprocate to her romantic suggestions and boldly asked [S.H.] if she would be interested in him performing oral sex on her there and then in the darkness of the late night. It was just a simple proposal, nothing else. If she would have said "no" that would have been the end of the matter. Cleveland would have gone on to the convenience store and gone back to his apartment.

Instead, [S.H.] immediately acquiesced and seductively pulled her panties to the side implicitly inviting Cleveland to perform his end of sexual bargain.[FN 2] Two consenting adults equally intoxicated (but not seriously intoxicated) having oral sex late at night living out a once in a lifetime sexual fantasy. Although unusual, odd, risqué, and in poor judgment, it was all totally consensual.

> [FN 2] While performing oral sex, Cleveland noticed that the young woman was secreting what appeared to be semen from her anal cavity suggesting that she had sex with someone else before Cleveland arrived at the scene.

However, Cleveland and [S.H.] lost in the moment of apparent sexual bliss soon learned that public sexual acts even those late at night have unexpected consequences – discovery. As it turned out, Isaiah Boyd (Boyd), one of [S.H.]'s long time friends, came out of the Bridge Lounge and observed them in what he believed was "consensual" oral sex in the dark but still within public view next to

> a white SUV. Boyd went into his car to place a call on his cell phone. After he completed his call, he went inside the Bridge Lounge and told his friend and bartender Wayne Jolla, Jr., of [S.H.]'s public sexual spectacle on the side street adjacent to the Bridge Lounge. Boyd and Jolla went outside and discovered that while [S.H.] and Cleveland were in the midst of oral sex and joined by an unknown third person who was obviously attempting to suck on [S.H.]'s breast nipples because of the public nature of the act. Cleveland, however, told the stranger to leave. When Boyd reappeared accompanied by Jolla, Jolla told [S.H.] and Cleveland to break it up before they got in trouble. After they got up, Jolla told Cleveland to leave. Cleveland left. Having been caught in the act by her friends, [S.H.] felt quite embarrassed but nonetheless was laughing about the entire ordeal as Cleveland left.[21]

Obviously, therefore, even petitioner does not dispute that he and S.H. engaged in oral sexual intercourse. Rather, he is instead disputing only that S.H. was incapable of resisting or of understanding the nature of the act due to her intoxication.

However, merely disputing an element of the crime will not suffice to state a credible actual innocence claim. Rather, to overcome the procedural bar, petitioner must make a credible showing of actual innocence supported by *new* evidence. As the United States Supreme Court has explained: "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* -- that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324 (emphasis added). Here, however, petitioner presents *no new evidence whatsoever*, much less new evidence of the type or caliber referenced in Schlup. For that reason, he obviously cannot make the showing necessary to meet the actual innocence exception, i.e. "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 327.

[21] Rec. Doc. 1, pp. 17-19.

Accordingly, because petitioner has established neither (1) the existence of "cause" for his default and resulting "prejudice" nor (2) that the Court's failure to address the claims would result in a "fundamental miscarriage of justice," his claim that his rights were violated by the trial court's failure to hold a hearing to give him an opportunity to prove actual bias on the part of the potential jurors is barred from federal review.

**B. Ineffective Assistance of Counsel**

Petitioner next claims that he received ineffective assistance of counsel at trial. In the last reasoned state court opinion addressing that claim, the Louisiana Supreme Court denied relief, stating: "[R]elator fails to show he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[22]

In Strickland, the United States Supreme Court established a two-prong test for evaluating ineffective assistance of counsel claims. Specifically, a petitioner seeking relief on such a claim is required to show both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland, 466 U.S. at 697. The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.

[22] State *ex rel.* Cleveland v. State, 180 So.3d 1280, 1281 (La. 2015); State Rec., Vol. 1 of 4.

See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Moreover, because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions*

> *were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (citations omitted; emphasis added). Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (quotation marks omitted; emphasis added). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claim.

Petitioner first argues that counsel was ineffective for failing to secure a "quantitative blood-alcohol test" to disprove the state's contention that the victim was too intoxicated to consent to the sexual relations at issue. That claim fails on both prongs of the Strickland analysis.

On the "deficient performance" prong of the analysis, counsel's failure to secure test results cannot be considered deficient performance for two reasons.

First, even if the blood sample still existed and was capable of being tested,[23] counsel had no way of knowing what the test would show. Because such a test *might* have revealed a high blood-alcohol level that would actually *harm* the defense, counsel cannot be considered to have performed deficiently for opting to forgo that line of investigation. See Harrington, 562 U.S. at 108 ("An attorney need not pursue an investigation … that might be harmful to the defense."). In fact, counsel had significant reason to fear that such results might in fact reveal harmful results, in that *multiple* witnesses indicated that the victim had been highly intoxicated.[24] Where, as here,

---

[23] In its response, the state notes that there is no indication that blood samples were even taken or, if so, whether such blood samples and the urine samples were preserved and available for later testing. Rec. Doc. 9, p. 23. That is accurate; however, the record does not definitively establish that blood samples were not taken or that blood and urine samples were not preserved. However, for the reasons explained herein, the Court cannot say that counsel was ineffective for electing to forgo such testing even if it is assumed that such testing was possible.

[24] State Rec., Vol. 2 of 4, transcript of July 20, 2011, p. 28 (Shintia Taylor: "[S.H.] was like – you could obviously tell that she was drunk, you know?"), 29 (Shintia Taylor: "[S.H.] was laying on the ground, and she was just like in a daze and she was just out of it, you know, and I was, like, '[S.H.], what happened? What's going on?' And she was

testing is as likely to incriminate the accused as to exonerate him, such testing is "a gamble not worth taking." Skinner v. Quarterman, 528 F.3d 339, 342 (5th Cir. 2008).

Second, the absence of the blood test actually provided a *benefit* to the defense in two ways.

As an initial matter, without test results establishing the *actual* degree of intoxication, counsel was able to present the testimony of his expert witness, Dr. William George, opining (without fear of scientific evidence to the contrary) that the level of drinking here might be expected to cause the victim to experience a "high" but was unlikely to cause incapacitation.[25]

Perhaps even more significantly, however, the absence of a definitive test result provided an undeniable additional benefit to the defense: it gave a basis for establishing reasonable doubt in the minds of the jurors. Counsel expressly used that tactic in his closing argument, stating:

> [S.H.]'s blood alcohol content, what was it? What was it? I want to know. I think we all want to know. What was it? How drunk was she? How much did she have to drink that night? …
>
> Detective Neely … [n]ever saw a toxicology report. Never asked for a toxicology report. He was never interested in a toxicology report. …
>
> The State has the burden of proving beyond a reasonable doubt that she was incapable of resisting or understanding the nature of the act of sexual intercourse by reason of stupor or abnormal condition of mind. I have kind of gone over what a stupor is and it kind of feels like an old word to me, kind of a hard one to define, but that's pretty bad off. So when we are talking about the blood alcohol content and the test that wasn't done, I want you to remember that the defendant gets the benefit out of every reasonable doubt arising out of the evidence or the lack of evidence. And that means you get to consider what tests were done and what tests were not.[26]

If defense is able to take advantage of the absence of test results to benefit its case, defense counsel cannot be considered to have performed deficiently for failing to secure the test results

---

like, 'I don't know,' like just out of it in a daze."), 30 (Shintia Taylor: "[S.H.] really seemed out of it, like she didn't know what was going on, and it really scared me."), 58 (Wayne Jolla: "[S.H.] was like – she just appeared out of it."; agreeing that she seemed "highly intoxicated" because "of the way she was acting. I'm not sure what she was drinking or what she had in there, but I know what I saw. She wasn't there."), 59 (Wayne Jolla: "[N]othing led me to believe she knew what was going on that night … [S]he was just out of it."), 68 (Detective Neely: "[S.H.] was still incoherent. She was intoxicated to the point she couldn't give me a statement.").

[25] State Rec., Vol. 2 of 4, transcript of July 20, 2011, pp. 121-30.

[26] State Rec., Vol. 3 of 4, transcript of July 20, 2011, pp. 9-11.

independently.  See, e.g., Skinner, 528 F.3d at 341-42 (counsel was not ineffective for failing to secure DNA test; "Conducting its own DNA test would … have deprived the defense of its primary argument at trial that the government conducted a shoddy investigation.  Not knowing what more thorough DNA testing would have uncovered, a jury might have found reasonable doubt in such uncertainty.").

Petitioner's claim also clearly fails on the "prejudice" prong of the Strickland analysis.  To prove that an inadequate investigation resulted in prejudice, a petitioner must point to evidence in the record demonstrating that further investigation would in fact have revealed additional information *beneficial* to the defense.  See Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec.11, 2008).  Here, there is no evidence that the proposed test results would in fact have been beneficial information; rather, plaintiff's assertion that the test would show that the victim was not so intoxicated as prevent her from consenting to the sexual act is entirely speculative.  It is beyond cavil that such bare speculation does not suffice to meet his burden of proof.  See Thomas v. Cain, Civ. Action No. 09-4425, 2009 WL 4799203, at *9 (E.D. La. Dec. 9, 2009).

Petitioner next argues that counsel was ineffective for failing to call as a witness the admissions nurse who authored the State Medical Report.  However, as the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, *we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and*

> *would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.* This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted; emphasis added); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

In this case, petitioner presented no evidence, such as an affidavit from the uncalled nurse, demonstrating that he or she was available to testify at the trial and would in fact have testified in a manner beneficial to the defense. Therefore, petitioner obviously failed to meet his burden of proof with respect to this claim. See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D.

Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Moreover, the fact that the nurse was not called could well be deemed to have provided a benefit to the defense. Specifically, the nurse's notes from the medical records were introduced at trial. This allowed defense counsel to interpret those notes in a manner beneficial to his client in closing arguments.[27] This, obviously, would not have been possible if the nurse had been called and testified in a way that cast doubt on that speculative interpretation.

Based on the foregoing, it is clear that that petitioner has failed to show that the state court's decision denying his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, under the doubly deferential standards of review mandated by the AEDPA, petitioner's claim should be denied.

That said, the Court additionally notes that petitioner blames his lack of evidence on the fact that he was not afforded a post-conviction evidentiary hearing in the state courts. However, that complaint is not cognizable in a federal habeas proceeding. Louisiana law expressly provides for summary disposition of post-conviction applications: "If the court determines that the factual and legal issues can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents submitted by either party or available to the court, the court may grant or deny relief without further proceedings." La. Code Crim. P. art. 929(A). Further, a state court's decision on such matters is not reviewable in federal court. As one court has explained:

> To the extent that petitioner complains that the State Court denied his post-conviction application without holding an evidentiary hearing pursuant to Louisiana Code of Criminal Procedure article 929(A), that claim is not cognizable in this federal habeas corpus proceeding. In this case, the trial court determined that it could properly resolve petitioner's post-conviction application pursuant to

[27] State Rec., Vol. 3 of 4, transcript of July 20, 2011, pp. 7-8.

> article 929(A). Federal courts "do not sit as a super state supreme court...." Taylor v. Cain, 2010 WL 6620876, *12 (W.D. La. 2010) citing Skillern v. Estelle, 720 F.2d 839, 852 (5th Cir. 1983). Thus, it is not the province of this court to determine if the state courts properly applied state law. Id. citing Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 480 (1991) and Narvaiz v. Johnson, 134 F.3d 688 (5th Cir. 1998). Moreover, the Fifth Circuit has repeatedly held that defects in a state habeas proceeding are not cognizable under 28 U.S.C. § 2254. Id. (and cases cited therein including Moore v. Dretke, 369 F.3d 844, 846 (5th Cir. 2004), Rudd v. Johnson, 256 F.3d 317, 319-20 (5th Cir.), cert. denied, 534 U.S. 1001, 122 S.Ct. 477, 151 L.Ed.2d 391 (2001), Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir. 1999); Kidd v. Keith, 2014 WL 463056, *5 (W.D. La. 2014) (citations omitted).

Pitts v. Tanner, Civ. Action No. 6:14-cv-3145, 2015 WL 10045174, at *23 (W.D. La. Dec. 14, 2015), adopted, 2016 WL 554884 (W.D. La. Feb. 10, 2016); accord Smith v. Terrell, Civ. Action No. 09-3791, 2009 WL 4799190, at *3 (E.D. La. Dec. 7, 2009).

Out of an abundance of caution, the Court further notes that petitioner also is not entitled to a federal evidentiary hearing to secure new evidence at this stage of review. On the contrary, the United States Supreme Court has expressly stated:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.
>
> This understanding of the text is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to the state courts. The federal habeas scheme leaves primary responsibility with the state courts. Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*.
>
> Limiting § 2254(d)(1) review to the state-court record is consistent with our precedents interpreting that statutory provision. Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did. State-court decisions are measured against this Court's precedents as of the time the state court renders its decision. To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision applies a

> rule that contradicts such law and how the decision confronts the set of facts that were before the state court. If the state-court decision identifies the correct governing legal principle in existence at the time, a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case. It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.

Cullen v. Pinholster, 563 U.S. 170, 181-83 (2011) (citations, quotation marks, brackets, and ellipsis omitted).

## C. Brady Violation

Petitioner's third claim is that the state violated his rights by its "interference in accessing material exculpatory evidence in violation of the Brady Rule …."[28] Specifically, he alleges:

> NOPD Detective Clifton Neeley, Sexual Assault Unit, failed to preserve and immediately test the victim's blood alcohol level. This test could have easily been ordered by NOPD Detective Clifton Neeley as part of the rape examination kit. Such testing was mandated in light of the simple test and in light of the critical "stupor" element of the simple rape charge. Detective Neeley could have put an end to the entire trial and simple rape charge.[29]

He further argues:

> Neeley failed to disclose a cooperative deal that he reached with [S.H.], Cleveland's co-offender of the public obscenity statute, La. R.S. 14:106(A)(1); (G)(1). Detective Neeley made this charge go away as part of the deal on the condition that she falsely pretend to be the "victim," by forgetting the incident – the latest deceptive device used by the State to circumvent Brady disclosures of testifying government *witnesses*.[30]

In the last reasoned state court opinion addressing that claim, the Louisiana Supreme Court denied relief, stating: "Relator fails to show the state withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)."[31]

---

[28] Rec. Doc. 1, p. 41.
[29] Id.
[30] Id. at p. 42.
[31] State *ex rel.* Cleveland v. State, 180 So.3d 1280, 1281 (La. 2015); State Rec., Vol. 1 of 4.

The AEDPA places severe limitations on this Court's review of that state court decision. The United States Fifth Circuit Court of Appeals has explained:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a Brady violation. See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (*en banc*) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, [a federal court] decide[s] whether the state court's Brady determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law. Busby v. Dretke, 359 F.3d 708, 717 (5th Cir. 2004).

Dickson v. Quarterman, 462 F.3d 470, 477-78 (5th Cir. 2006).

As noted, in the last reasoned state court opinion addressing petitioner's claim, the Louisiana Supreme Court cited Brady in denying petitioner's claim. Because the court correctly identified the clearly established federal law governing petitioner's claim, and because he has not pointed to (and the undersigned's research has not found) a United States Supreme Court case with materially indistinguishable facts reaching a contrary result, this Court need only determine whether the Louisiana Supreme Court's application of Brady was "unreasonable." For the following reasons, the undersigned concludes that it was not.

With respect to a claim that the prosecution withheld evidence in violation of Brady and its progeny, the United States Supreme Court has held:

> A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (internal citations and quotation marks omitted). Therefore, to prevail on a Brady claim, a petitioner "must show that (1) the state

withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment."  DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002).

With respect to a blood alcohol test, petitioner apparently concedes that no such test was ever performed.  Where, as here, no test was performed, then necessarily the nonexistent results of the unperformed test were not *withheld* in violation of Brady.  See, e.g., Brogdon v. Blackburn, 790 F.2d 1164, 1168 (5th Cir. 1986) ("The state asserts that it has no knowledge of a blood alcohol test being conducted on Brogdon's blood sample.  Without some stronger indication this evidence exists, Brogdon's claim must fail.  The prosecution has no duty to turn over to the defense evidence that does not exist.").  Further, to the extent that petitioner is arguing that Brady compelled Neely to order such as a test as part of his investigation, that argument is simply incorrect.  As the United States Fifth Circuit Court of Appeals has explained:

> According to Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Constitution requires the prosecution to reveal material evidence favorable to the defendant upon the defendant's request.  Brady, however, does not extend due process to the point of requiring the state to pursue every possible avenue of investigation and make the defendant's case for him.

Johnston v. Pittman, 731 F.2d 1231, 1234 (5th Cir. 1984)

With respect to a purported "cooperative deal" between Neely and the victim, that component of petitioner's claim similarly fails.  Petitioner has no evidence that such a deal existed.  Without such evidence, he cannot prove a Brady violation.  See Medellin v. Dretke, 371 F.3d 270, 281 (5th Cir. 2004); Murphy v. Johnson, 205 F.3d 809, 814 (5th Cir. 2000) ("Murphy has failed to establish a *prima facie* claim under Brady by virtue of his having failed to demonstrate the existence or concealment of a deal between the prosecution and the witness ….  Allegations that are merely 'conclusionary' or are purely speculative cannot support a Brady claim."); Coleman v. Cain, Civ. Action No. 07-3655, 2014 WL 348541, at *9 (E.D. La. Jan. 31, 2014) (Milazzo, J.)

("Petitioner has failed to establish the existence of a deal between [a witness] and the State, which dooms his Brady claim.").

For all of these reasons, petitioner has failed to show that the state court's decision denying his Brady claim was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, under the deferential standards of review mandated by the AEDPA, his Brady claim should be denied.

## D. Unconstitutionally Vague Statute

Petitioner's final claim is that his right to due process was violated because he was not put on "fair notice of the prohibited conduct."[32] Specifically, he argues:

> Petitioner asserts that the simple rape statute is unconstitutionally vague, allowing the state, the district judge, and the jury to arbitrarily convict him on an overly broad reading and standardless interpretation of "stupor" that swept within its reach a "miscellaneous incident" of public obscenity with a maximum sentence of three (3) years into a "simple rape" through police officers' selective discriminatory enforcement abuse and allowed the state prosecutors to perpetrate a manifest miscarriage of justice repugnant with due process and equal protection of his constitutional rights and "inconsistent with the rudimentary demands of justice."[33]

He further alleges that he "was arbitrarily treated and discriminated against simply because of his race (white), his age (50), and his gender (male)," as well as his "socio-economic status."[34]

The Louisiana Supreme Court denied that claim on the ground that petitioner failed to meet his burden of proof.[35] For the following reasons, it is clear that petitioner has not established that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, relief should be denied.

[32] Rec. Doc. 1, p. 46.
[33] Id. at p. 48.
[34] Id. at pp. 52-53.
[35] After expressly rejecting petitioner's Brady and Strickland claims, the Louisiana Supreme Court then held: "As to his remaining claims, relator has failed to satisfy the post-conviction burden of proof. La.C.Cr.P. art. 930.2." State *ex rel.* Cleveland v. State, 180 So.3d 1280, 1281 (La. 2015); State Rec., Vol. 1 of 4.

As to the claim that the statute was unconstitutionally vague in its use of the word "stupor," that claim is clearly meritless for the following reasons.

The United States Supreme Court has explained:

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Village of Hoffman Estates v. Flipside, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine "is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement." Smith, *supra*, 415 U.S. at 574, 94 S.Ct., at 1247-1248. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." Id., at 575, 94 S.Ct., at 1248.

Kolender v. Lawson, 461 U.S. 352, 357-58 (1983).

In the instant case, the applicable statute outlawed "anal, oral, or vaginal sexual intercourse" "deemed to be without the lawful consent of a victim because it is committed," *inter alia*, "[w]hen the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity." La. Rev. Stat. Ann. § 14:43(A)(1).[36] Obviously, that crime is sufficiently defined in the statute so as to avoid the possibility of "arbitrary and discriminatory enforcement" and to place an ordinary person on notice that the conduct alleged and proved at trial in this case (oral sexual intercourse with an obviously

[36] As previously noted herein, at the time of petitioner's conviction, this crime was known as "simple rape"; however, it is now known as "third degree rape." Despite this change in name, the elements of the quoted statutory provision have not changed.

incoherent, seriously intoxicated woman) would clearly be unlawful. For petitioner to argue otherwise is, in a word, ludicrous.

Lastly, out of an abundance of caution, the Court notes that to the extent that petitioner is attempting to assert a selective prosecution claim, he has not shown that relief is warranted. As the United States Fifth Circuit Court of Appeals has explained:

> The decision to prosecute one person and not another is a proper exercise of executive discretion with which we are reticent to interfere. United States v. Hoover, 727 F.2d 387, 389 (5th Cir. 1984). To establish that the government has engaged in unconstitutionally discriminatory selective prosecution, a defendant must make a two-pronged showing.
>
> First, he needs to make out a *prima facie* showing that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted. See United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); United States v. Sparks, 2 F.3d 574, 580 (5th Cir. 1993); Hoover, 727 F.2d at 389. … Second, he must demonstrate that the discriminatory selection of him for prosecution is invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights. See Sparks, 2 F.3d at 580; Hoover, 727 F.2d at 389.
>
> In making these requisite showings, the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner. Hoover, 727 F.2d at 389. To dispel the presumption of prosecutorial good faith, "a criminal defendant must present 'clear evidence to the contrary.'" Id. at 465, 116 S.Ct. 1480 (quoting United States v. Chemical Found., Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)).

United States v. Weber, 162 F.3d 308, 333-334 (5th Cir. 1998); accord United States v. Jennings, 724 F.2d 436, 445 (5th Cir. 1984) ("In order to prevail in a defense of selective prosecution, a defendant must meet two requirements which we have characterized as a heavy burden. First, he must make a *prima facie* showing that he has been singled out for prosecution although others similarly situated who have committed the same acts have not been prosecuted. Second, having made the first showing, he must then demonstrate that the government's selective prosecution of him has been constitutionally invidious." (citations and quotation marks omitted)). Here, petitioner cannot even make it past the first prong of that analysis.

**RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Scott Cleveland be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[37]

New Orleans, Louisiana, this sixteenth day of January, 2018.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

[37] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.